**THE THATER LAW GROUP, P.C.**
M. LANI ESTEBAN-TRINIDAD
Nevada Bar No. 006967
7000 Smoke Ranch Rd., Ste. C
Las Vegas, Nevada 89128
Telephone: (702) 736-5297
Fax: (702) 736-5299
Email: lani@thaterlawgroup.com
Attorney for Plaintiff
RICHARD CASPER

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| RICHARD CASPER, an individual; <br> Plaintiff, <br> vs. <br> DIAMOND RESORTS INTERNATIONAL MARKETING, INC., a foreign corporation; DIAMOND RESORTS INTERNATIONAL, INC., A Delaware corporation; DOES 1 through 10 inclusive; DOES & ROES CORPORATIONS/ ENTITIES 1 through 10 inclusive; DANIEL PERCY, an individual, <br> Defendants. | **COMPLAINT** <br><br> **(JURY TRIAL DEMANDED)** |

Plaintiff RICHARD CASPER for his causes of action against the above-named Defendants, complains and alleges as follows:

**I.**
**INTRODUCTION**

This is an employment retaliation claim. After several years generating millions of dollars in sales, Defendants fired Plaintiff Richard Casper in retaliation for his complaint of sexual battery on part of Defendants Vice-President Daniel Percy against Mr. Casper's fiancée. The sexual assault and harassment occurred while Plaintiff CASPER and his fiancée were guests of Diamond Resorts during Defendants' sponsored work event at a Diamond Resort accommodation in Mexico.

-1-

Prior to terminating his employment, Plaintiff Casper had been one of the very top sales persons at Diamond Resorts. Everything changed when he made a report of sexual battery committed by Defendant PERCY upon his fiancée.

## II.
## PARTIES & JURISDICTION

1. This is an action brought pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et. seq.* and supplemental state law claims

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as this matter involves a federal question and supplemental state law claims.

3. Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claim occurred in the District of Nevada. Venue is also proper in this District under 28 U.S.C. §1391(b)(1) because Defendants conduct business and reside in the District of Nevada.

4. Plaintiff RICHARD CASPER (hereinafter "CASPER") is and was, at all times relevant hereto, an individual presently residing in the State of Nevada, Las Vegas. Plaintiff was an "employee" under 42 U.S.C. §2000e (f), and 29 U.S.C. §203(e), for the purposes of this action.

5. Upon information and belief, Defendant DIAMOND RESORTS INTERNATIONAL MARKETING, INC., ("DRIM") is a foreign corporation, registered with the Nevada Secretary of State, and is and was, at all times relevant herein doing business in the State of Nevada, Las Vegas with location at 10600 West Charleston Blvd., Las Vegas, Nevada 89135. Defendant DRIM, and each of them, are an "employer" under 42 U.S.C. §2000e(b), and 29 U.S.C. §203(d) for purposes of this action.

6. Upon information and belief, Defendant DIAMOND RESORTS INTERNATIONAL, IN. ("DRII"), is a Delaware corporation and has a principal place of business located at 10600 West

Charleston Blvd., Las Vegas, Nevada, 89135. Prior to September 2, 2016, DRII was a publicly-held company. On September 2, 2016, DRII was merged into, and therefore acquired by, a fund managed by APOLLO MANAGEMENT VIII, L.P., which is controlled by Defendant Apollo Global Management, LLC, in an all cash transaction. Since September 2, 2016, the date this "going private" transaction was consummated – DRII and all of its various affiliates and subsidiaries, including, but not limited to Defendant DRIM, have been owned and controlled by Apollo.   Defendant DRIM and DRII are hereby identified collectively as "DIAMOND RESORTS Defendants" or "DIAMOND RESORTS".

7.      Upon information and belief, Defendant DANIEL PERCY (hereinafter "PERCY"), is and was, at all time relevant hereto an employee and/or officer of Defendant DRIM or DRII, who was residing in Las Vegas, Nevada and now residing and/or working in the State of Hawaii, as an employee or agent of the DIAMOND RESORTS Defendants.

8.      Plaintiff CASPER timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) against DRIM. Plaintiff files this suit with a Right to Sue Letter from the EEOC.

9.      Upon information and belief, and at all times relevant hereto, Defendants named and/or fictitiously named, and/or other names, or each of them, were the agents, ostensible agents, servants, employees, employers, alter-egos, partners, co-owners and/or joint ventures of each other and of their co-Defendants, and were acting within the color, purpose, and scope of their employment, agency, ownership, and/or joint ventures, and by reason of such relationships, the Defendants, and each of them, are jointly and severally responsible and liable for the acts or omissions of their co-Defendants, as alleged herein. The true names and capacities whether individual, corporate, associate or otherwise of Defendants DOES I through X, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believe and therefore, alleges that each of the Defendants designated herein as a ROE and

DOE is/are legally responsible in some manner for the events and happenings herein referred to and legally caused injury and damages proximately thereby to Plaintiff as herein alleged. Plaintiff is informed and believes and thereon alleges that Defendants participated in, ratified and/or condoned the acts complained of in Plaintiff's Complaint and the subject matters of this action.

10. All Defendants named herein and fictitiously named herein are joint employers for the purposes of this action and are jointly and severally liable to Plaintiff for damages herein.

## III.
## FACTUAL ALLEGATIONS

### THE PARTIES

### DIAMOND RESORTS

11. DIAMOND RESORTS Defendants own a network of 379+ vacation resort/accommodation destinations in 35 countries around the world and sells vacation ownership points to the public. The points may be used for Vacation Resorts, Hotels, Cruises, accommodations, events, and activities, sponsored by and/or otherwise controlled or owned by the DIAMOND RESORTS Defendants.

### RICHARD CASPER

12. On or about April, 2014, Defendant DRIM hired Plaintiff CASPER as a Vacation Counselor for Cancun Resort in Las Vegas, Nevada. Defendant DRIM paid Plaintiff CASPER a base compensation of minimum hourly wage plus base commissions.

13. Within a few short months, Plaintiff CASPER exceeded all sales expectations and site records.

14. Plaintiff CASPER became one of Defendant DIAMOND RESORTS top sales producers, generating and earning individual earnings from sales commissions of approximately $450,000.00 in 2014 (an eight (8) month period of employment); in 2015, approximately $1.5 million and, in 2016 and 2017, approximately $2.4 million dollars each year.

15. In addition to being an employee of DIAMOND RESORTS Defendants, Plaintiff CASPER is and has been a Diamond Resort Gold Loyalty Owner with Diamond Resorts since about 2015 to present date.

16. As an Owner, Plaintiff CASPER owns certain timeshare "points" and is allowed access to DIAMOND RESORTS Defendants', properties and/or accommodations throughout the world, including, Mexico.

17. Plaintiff CASPER's job duties with DIAMOND RESORTS included selling certain upgrades to existing owners of "Diamond Resorts Points". '

18. DIAMOND RESORTS In-house Marketing and/or Tele-Sales would entice existing DIAMOND RESORTS owners with by free gifts such as Las Vegas shows, activities or Visa Cards (up to $275) to attend "owner meeting updates," which were in reality and undisclosed to owners at time of booking appointment, actually a Sales Presentation, presided over by sales persons, or Vacation Counselors, such as Plaintiff CASPER.

19. Defendant DIAMOND RESORTS instructed Plaintiff CASPER to greet owners at Tour Reception, prior beginning a sales presentation.

20. Defendant DIAMOND RESORTS required CASPER educate owners on their ownership points and discovery information about the owners so as to create a reason why these owners needed to purchase even more Diamond Points. Pursuant to a policy of DIAMOND RESORTS, Plaintiff CASPER showed these owners how to use (buy more), go to a higher Loyalty level or simply convince owners to travel more with points of instead of using cash, which involved, buying more "points" from DIAMOND RESORTS.

21. At instruction of DIAMOND RESORTS, Plaintiff CASPER was asked to identify or facilitate issues that were "wrong" with the owners' current ownership points.

22. DIAMOND RESORTS placed CASPER, and other sales persons, on an incentive based sales quota, in order to keep their jobs, sales persons, and Vacation Counsellors, such as Plaintiff CASPER, were required to sell a minimum amount of ownership points to the public.

23. Defendant DIAMOND RESORTS management recognized Plaintiff CASPER as the Floor General, and recognized as such by the other sales staff throughout the DIAMOND RESORTS Sales Center Resort which CASPER worked.

24. Defendants DIAMOND RESORTS instructed CASPER to train other Vacation Counselors on Sales Tactics, assist other Vacation Counselors and Managers on closing sales deals. Plaintiff CASPER was required to correct or report any errors, mistakes or wrong-doing by Vacation Counselors on floor to upper Management at DIAMOND RESORTS.

25. Defendant DIAMOND RESORTS management also referred to Plaintiff CASPER as a Franchise Player.

26. Plaintiff CASPER performed his job exceptionally well and was highly respected by management and his peers.

27. As part of his job duties and DIAMOND RESORTS policies and procedures, Defendant DIAMOND RESORTS required Plaintiff CASPER to present owners with a contract, as soon as these owners agreed, after a sales presentation, to buy more points from DIAMOND RESORTS.

28. Consistent with DIAMOND RESORTS procedure, prior to signing contract, CASPER would review entire contract with the owner, including, but not limited, to owners' name address and contact information amount of points purchased, terms of financing, and any other extras offered included in sale. The DIAMOND RESORTS policy was as follows:  First, Plaintiff CASPER would go over terms of the proposed sales contract for points.  While contract was being processed at corporate level, Plaintiff CASPER would go over additional documents related to the sale and Nevada Real Estate Duties Form-Owners, for signing or initialing all company and state disclosures.  Once DIAMOND RESORTS corporate returned the proposed contract back to CASPER on-site, DIAMOND RESORTS required CASPER to personally escort owners to Quality Assurance (QA) Department, where another set of company representatives repeated the contractual review process and signed the owners. Prior to QA , but before Casper's Manager or Supervisor of the Day, would also meet with the owner and have them sign an acknowledgement disclosure form of what they were purchasing and confirm or deny any representations Casper made. After this process, Plaintiff CASPER was required to greet the newly signed owners with their gift as promised when they attended the sales presentation-owner update meeting and answer any further questions, prior to concluding.

29. In or about 1996, Plaintiff CASPER met his fiancée, Norma Jean McGrath in Las Vegas, Nevada. Plaintiff became engaged to Ms. McGrath marry on or about 2015.

30. At the time of the engagement, Plaintiff CASPER was already working in Las Vegas, Nevada with DRIM as a Vacation Counselor. Ms. McGrath was known to certain Diamond Resorts employees, including Defendant PERCY, as Plaintiff CASPER's fiancée.

## ASSAULT BY DANIEL PERCY AT DIAMOND RESORTS PROPERTY

31. In or about November, 2017, Plaintiff CASPER and Ms. McGRATH travelled together from Las Vegas, Nevada to Cabo San Lucas, Mexico to participate in the DIAMOND RESORTS Defendants "1st Annual Chief Executive Circle" event and "Diamond Event of a Lifetime/Diamond Concert Series" for DIAMOND RESORTS owners and prospective owners.

32. This DIAMOND RESORTS event in Cabo San Lucas, Mexico was billed as hosted by DIAMOND RESORTS Chief Executive Officer, Michael Flaskey. Defendant DIAMOND RESORTS paid for both Plaintiff and Ms. McGrath's airfare, ground transportation, accommodations and food on certain days and nights.

33. This DIAMOND RESORTS event was a work-related function whereby winners of a sales contest (such as Plaintiff CASPER) were to attend work-related sales dinners with their significant others and work sponsored events and provided accommodations at a DIAMOND RESORTS property with several other co-workers/sales contest winners.

34. During this event, Defendants DIAMOND RESORTS required CASPER to mingle at dinner with other DIAMOND RESORTS owners at certain places and times designated by DIAMOND RESORTS.

35. During dinner on the first night of the event, Defendant PERCY sat at the same table as the Plaintiff and sat next to Ms. McGrath.

36. Following dinner, DIAMOND RESORTS sponsored a concert by country singer, Cole Swindell.

37. Plaintiff and his fiancée attended the concert with other DIAMOND RESORTS owners, including, Defendant PERCY.

38. Plaintiff and Ms. McGrath left before the concert ended to retire early to their guest accommodations.

39. Upon information and belief, after the concert, Defendant PERCY and other DIAMOND RESORTS employees and contest winners were invited by Michael Flaskey to his Penthouse Suite at Cabo Azul for more cocktails and then later to the hotel bar, whereupon Defendant PERCY and another Diamond Resorts employee were nearly engaged in an altercation.

40   Upon information and belief, PERCY was drinking heavily at the dinner, the concert, and at Flaskey's Suite and hotel bar.

41. Plaintiff's guest accommodations at the DIAMOND RESORTS event were at guest bedroom at Villa Palmila, a DIAMOND RESORTS property ("Villa"). The Villa was a well-appointed house with several bedrooms. Plaintiff and Ms. McGrath had their own bedroom and shared the Villa with other Diamond Resorts employees and contest winners who occupied the other bedrooms.

42. To get to Plaintiff's bedroom in the Villa, it was necessary to walk through two sets of double doors.

43. Later that evening as Plaintiff slept in bed with Ms. McGrath, Defendant PERCY suddenly and unexpectedly barged into Plaintiff's bedroom at the Villa.

44. Plaintiff and Ms. McGrath were shocked and suddenly startled awake by Defendant PERCY'S abrupt intrusion into their bedroom at night, as they slept. Ms. McGrath was laying on top of the covers, and not wearing any clothing but her thong underwear.

45. Before Plaintiff could make sense of the sudden intrusion, Defendant PERCY jumped into the bed upon which Plaintiff and Ms. McGrath had been sleeping, forcefully lying next to CASPER. At which point, Defendant PERCY said, "I love you Rick," and put his arm around CASPER, telling CASPER, "let's go party!"

46. Simultaneously and unbeknownst to CASPER at that time, while in Plaintiff's bed, Defendant PERCY started rubbing on Ms. McGrath's bare buttocks, without her consent. Defendant PERCY then yelled, "Damn! Norma Jean (McGrath) you have a nice ass!" whereupon CASPER immediately told PERCY to get out of the room.

47. Shocked and scared, Ms. McGrath could not bring herself to say anything to PERCY, with CASPER present, for fear of an altercation between the two.

48. Defendant PERCY left and went to the pool area of the Villa, whereupon Plaintiff and Ms. McGrath overheard PERCY loudly tell the other Villa guests and their spouses that Ms. McGrath has a "great ass."

49. After the intrusion, Plaintiff and Ms. McGrath tried to lock all the doors but could not find them and he went back to bed.

50. Not long thereafter, Defendant PERCY returned to Plaintiff's bedroom, barging in once again, and jumped into Plaintiff's bed, startling and shocking Plaintiff and Ms. McGrath for a second time that night.

51. Upon the second intrusion, Defendant PERCY continued to ask Plaintiff to, "come party, come party!" Once again, Defendant PERCY started rubbing Ms. McGrath's bare buttocks. Ms. McGrath again could not bring herself to say anything to PERCY, with CASPER present, for fear of an altercation.

52. Plaintiff CASPER told Defendant PERCY to leave their bedroom, telling PERCY that CASPER just had surgery a month before. Defendant PERCY left, but returned, a third time, during which Defendant PERCY just stood by the Plaintiff's bedroom door, staring into the room, telling CASPER that he loved him.

### CASPER COMPLAINS TO HIS EMPLOYER; REQUESTS INVESTIGATION

53. When Plaintiff and Ms. McGrath returned to Las Vegas, Ms. McGrath confided in CASPER, telling him that Defendant PERCY had rubbed her bare buttocks on the two occasions that PERCY barged into and intruded upon them during the night at the Villa in Mexico.

53. As a result, CASPER became upset and, the next day, CASPER went to Diamond Resorts corporate office on West Charleston to make a formal complaint of sexual assault against Defendant PERCY.

54. When CASPER arrived at the office, CASPER spoke with WILLIAM McCOY (Senior VP of WBU) and TONY WALKER (Mr. McCoy's superior the number two person in the company). CASPER told both what happened at the Villa and told both that PERCY had subjected his fiancée, Ms. McGrath, to unwanted sexual advances. Both appeared upset and asked CASPER what he wanted done about it.

CASPER told them he wanted to know what DIAMOND RESORTS was going to do about PERCY's unacceptable behavior.

55. Mr. McCoy and Mr. Walker informed CASPER that they would investigate the incident and told CASPER not to attend a mandatory company function that night or the next night and to stay home and not come to work until the matter was resolved.

56. CASPER asked if both if he should contact Diamond Resorts Human Resources. Mr. Walker replied, "no, we are HR."

57. Thereafter, Nizar Jabara, from Diamond Resorts Human Resources contacted CASPER by phone and told him he would investigate the incident. CASPER told Mr. Jabara what happened at the Villa in Mexico. Mr. Jabara asked if there were any witnesses, other than CASPER, M. McGrath and PERCY. CASPER told him that there were co-workers/fellow contest winners at the pool at the Villa, including, manager, Mr. Guttierez, who would have heard Mr. Percy talking about Ms. McGrath's buttocks.

58. Ms. McGrath also told Diamond Resorts Human Resources what had happened, during which the HR interviewer replied, "sorry you went through this." Ms. McGrath also told Mr. Jabara that she was afraid for CASPER's job at the company because of what happened with PERCY in Mexico. Mr. Jabara told Ms. McGrath that CASPER would not be fired.

59. On or about a week or so later, CASPER received a phone call from Mr. Jabara. He told CASPER to come back to work immediately and that the investigation was complete. CASPER asked what the result was, Mr. Jabara replied that PERCY was, "no longer at Polo Towers." CASPER asked if he was fired, Mr. Jabra again repeated that Mr. Percy is "no longer at Polo Towers."

60. Upon information and belief, Defendant PERCY had not been fired, but had been laterally transferred to the same position he held in Las Vegas, Nevada to another Diamond Resorts property in Hawaii.

61. Plaintiff CASPER asked about whether CASPER would get paid for the time he was told to take off work pending the investigation. CASPER had missed approximately two (2) weeks of income and opportunity to earn commissions, which CASPER relied upon for his earnings, as the top sales person for the company. Mr. Jabara replied he would not.

-10-

**RETALIATION IN AFTERMATH OF COMPLAINT**

62. After CASPER returned to work following the complaint and investigation, things at work changed completely. Plaintiff CASPER went from being the company "golden boy," to being alienated. CASPER felt singled out by changes in procedures and policies that were designed to drastically reduce his commission income. At the company awards ceremony, where CASPER received an award for Global Salesman of the Year (for the second time), CASPER's colleagues did not contact him to join in festivities or events as they normally did. CASPER believes they did so with the hopes that CASPER would become upset and quit.

63. Upon information and belief, Mr. McCoy told Diamond Resorts employees and and/or management that CASPER would not be returning to work after the awards ceremony, thereby supporting CASPER's belief that the company wanted to fire him after his complaints about PERCY.

64. About two weeks after CASPER returned to work, Mr. McCoy told CASPER that CASPER had gone after "one of (his) children" (referring to one of them as PERCY). Mr. McCoy said if it would have been someone else, it would have been a different outcome.

65. Less than two months later, on or about January 26, 2018, the company fired CASPER for pre-textual reasons, alleging "cause" based on owner complaints. Prior to his termination, Plaintiff CASPER had not been formally disciplined about complaints in over two years. Moreover, CASPER received complaints and cancellations in the previous years but was not similarly disciplined or fired.

**PRE-TEXTUAL TERMINATION**

66. Plaintiff CASPER believes he was fired for voicing his opposition to the actions of PERCY, a company Vice-President, as against his fiancée, during a company sponsored event while staying as guests on company property, thereby firing him in retaliation for his complaints of sexual harassment assault against his fiancée. Plaintiff CASPER believes his participation in the investigation against PERCY was also a basis for termination of his employment in retaliation.

67. Defendants termination of CASPER were pre-textual because any complaints, CASPER received were a direct and proximately result of CASPER following policies, procedures, mandates, and/or instructions from DIAMOND RESORTS management about the manner and method by which he would

conduct, execute, explain, and/or sell DIAMOND RESORTS products to the public and existing Diamond Resorts point owners.

68. In particular, DIAMOND RESORTS specifically instructed CASPER and other timeshare sales persons, under threat of termination or discipline, to misrepresent certain meetings to existing DIAMOND RESORTS owners as "owner update meetings," when in fact these "update meetings" were "sales presentations" in disguise whereby existing Diamond Resorts member point owners would attend believing they were attending an "owner update meeting" about their investment, only to have a meeting that was presided over by a commissioned sales person, such as CASPER, who would then, at DIAMOND'S specific direction, attempt to high pressure sell these existing owners, certain upgrades and additional Diamond Resorts products as additional investments in their point ownership.

69. DIAMOND RESORTS provided CASPER with certain specific information pertaining to existing individual Diamond Resorts owners, including their credit-worthiness and "points-owned" information, with direct and specific instructions that CASPER target these individuals for additional sales in these so-called owner "meetings." It was the practice of DIAMOND RESORTS to give CASPER the largest point-owners, the more points that were owned, typically meant the larger the income and better credit, resulting in a higher probability that CASPER would sell these existing owners on contract for additional points.

70. During the time period immediately preceding his termination, CASPER had not generated any new deals from October, 2016 to the month of his termination. As such, any complaints that DIAMOND alleges were a basis for CASPER's termination in January, 2018, were complaints and/or cancellations from the previous years, for which he was not timely disciplined or reprimanded.

## IV.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEVADA REVISED STATUTE §613.310 et. seq. and
### 42 U.S.C. SECTION 2000e-3 RETALIATION

71. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

-12-

72. Defendant DIAMOND RESORTS retaliated against Plaintiff CASPER in violation of Section 704(a) of Title VII and/or applicable anti-retaliation provisions by taking adverse employment action against him including, but not limited to, wrongfully terminating Plaintiff's employment for pre-textual reasons because of his participation in and/or opposition to practices and/or actions of Defendants that are unlawful by virtue of Title VII.

73. Defendants conduct directly and proximately caused Plaintiff CASPER to suffer loss of wages, loss of earning capacity and loss of employment, as well as severe emotional and physical distress for which he claims compensatory and punitive damages from Defendants.

74. Defendants actions were intentional, deliberate, willful, malicious, reckless and conducted in callous disregard for the harm caused to Plaintiff.

75. Plaintiff CASPER is entitled to all legal and equitable remedies available under Title VII as a result of the retaliation suffered as a result of Defendants conduct.

76. Plaintiff CASPER has been required to engage the services of an attorney to represent their interests and therefore Plaintiff is entitled to an award of attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

77. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs about, as though set forth fully herein.

78. The conduct of Defendants, and each of them, its agents, employees, and/or representatives, was extreme and outrageous and done for the purposes of injuring Plaintiff.

79. The conduct of Defendants, and each of them, its agents, employees, and/or representatives were intentional malicious, willful and outrageous, outside the bounds of normal decency, and therefore constitutes intentional infliction of emotional distress to Plaintiff.

80. That as a direct and proximate result of Defendants conduct, and each of them, Plaintiff suffered emotional distress which caused and will continue to cause Plaintiff extreme mental and nervous pain and suffering.

81. That as a direct and proximate result of Defendants conduct, and each of them, Plaintiff incurred and/or continue to incur medical expenses, possible future medical expenses, and loss of enjoyment of life, all to said Plaintiff's general damages, according to proof to be determined at time of trial.

82. As a direct and proximate result of Defendant PERCY's actions, Plaintiff suffered damages, according to proof to be determined at time of trial, and is entitled to recover the same from Defendant.

83. Plaintiff has been required to engage the services of an attorney to represent their interests and therefore Plaintiff is entitled to an award of attorneys' fees and costs.

WHEREFORE, Plaintiff prays for the following relief:

1. For back-pay, front pay, lost benefits, statutory and other recoverable damages, and pre-judgment interest;

2. For all compensatory damages, and other damages, permitted by law, according to proof, to be determined at time of trial;

..

..

..

..

..

..

..

..

-14-

3. Punitive damages, according to proof to be determined at time of trial;

4. Attorney's fees, expenses and costs of suit;

5. All other legal and equitable relief allowed by Federal and State law; and

6. Such other and further relief as the Court may wish to entertain.

DATED this 3rd day of August, 2018.

**THE THATER LAW GROUP, P.C.**
BY:/s/ M. Lani Esteban-Trinidad
M. Lani Esteban-Trinidad
7000 Smoke Ranch Rd., Ste. C
Las Vegas, Nevada 89102
Tel: (702) 736-5297
Facsimile: (702) 736-5299
Email: lani@thaterlawgroup.com
Attorney for Plaintiff
RICHARD CASPER

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all issues.

DATED this 3rd day of August, 2018.

**THE THATER LAW GROUP, P.C.**
BY:/s/ M. Lani Esteban-Trinidad
M. Lani Esteban-Trinidad
7000 Smoke Ranch Rd., Ste. C
Las Vegas, Nevada 89128
Tel: (702) 736-5297
Facsimile: (702) 736-5299
Email: lani@thaterlawgroup.com
Attorney for Plaintiff
RICHARD CASPER